## KING v. MOORE et al.

(Supreme Court, Appellate Division, Fourth Department.   April 30, 1901.)

MECHANICS' LIENS—FORECLOSURE—DEFECTIVE MATERIALS—PAINTING—SCALING
    AND BLISTERING—MOISTURE—EFFECT OF TURPENTINE.
        Plaintiff agreed to paint a house for defendant with the best of mate-
    rial, and in a thorough workmanlike manner, using three coats of white
    lead and linseed oil; all damage from rain, etc., being borne by plaintiff.
    When painting was completed, there were "blisters" where the paint had
    scaled up from the wood and had water under it.   There had been no
    fire in the house for some time during and after the painting until the
    furnace had been started to dry the plaster.   Plaintiff claimed that the
    blisters were caused by dampness being driven out through the plaster,
    sheathing, siding, and priming, so as to raise the outside coat of paint.
    Plaintiff, however, had used turpentine in the paint, in violation of the
    contract, and it was shown that the use of turpentine was apt to cause
    blistering.   The blisters were between the outer coats and the priming,
    leaving the priming undisturbed; and some work that had been painted
    by a workman other than plaintiff did not blister.   Plaintiff was about
    the house constantly during the time there was no fire in it, and later
    when the fire was built, and offered neither objection nor suggestion as
    to the effect of dampness or heat on the paint.   *Held* sufficient to show
    that the imperfections in the painting were caused by defects in material
    and workmanship, and hence plaintiff was not entitled to foreclose a
    mechanic's lien for such part of the contract price as was necessary to
    indemnify defendant for his damage.

Appeal from special term, Niagara county.

Action by Edgar King against Allen N. Moore and another.   From
a judgment in favor of plaintiff, defendants appeal.   Reversed.

The action was commenced on the 18th day of May, 1900, to foreclose a
mechanic's lien against a house and lot situate in the city of Lockport, in the
county of Niagara, N. Y., owned by the defendant Moore, to secure the sum
of $120, with interest thereon, the amount claimed to be due and owing to
the plaintiff from the defendant Allan on account of painting the buildings
on said premises, and furnishing materials therefor, under a contract entered
into between the plaintiff and said Allan, dated the 17th day of October, 1889.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WIL-
LIAMS, and LAUGHLIN, JJ.

Root & Orton, for appellants.
W. B. Simpson, for respondent.

McLENNAN, J.   The contract entered into by the plaintiff and
Allan provided that the plaintiff "should furnish the materials and
perform all the labor necessary to paint in every respect in the most
substantial and workmanlike manner, according to the specifications,
which are hereby made a part of this agreement, the Dr. Allen Moore
house and barn now being erected on the corner of Niagara street and
Transit street, in the city of Lockport, N. Y.   *   *   *   It is hereby
understood and agreed by and between the parties hereto that the out-
side of the house is to be given three coats of paint, and the outside
of the barn two coats, and no more.   All the painting to be done on
said house and barn as per the aforesaid specifications."   The de-
fendant Allan agreed to pay to the plaintiff for such materials and
labor the sum of $390, as follows:

"First, one hundred dollars when the outside of the house is fully painted, except the veranda and steps; second, one hundred dollars when the inside of the house is painted one coat filler and one coat varnish; third, the balance of one hundred and ninety dollars within ten days after the painting is completed as per said plans and specifications, with the exceptions above mentioned."

The specifications, so far as it is important to note, provided:

"Material used in construction of work to be of the best of the kind specified; and all work to be done in the best, most substantial, thorough, and workmanlike manner. * * * The painter must see that all woodwork is perfectly clean before filling; * * * cover all knots, sap, and pitchy places of woodwork with a good coat of strong shellac before priming, and kill knots and pitch with lime where necessary. * * * Pure linseed oil, pure American white lead, the best pigments, and pure shellac [must be used]. * * * All exterior work must be primed as soon as the weather will allow, of shade directed, and all work done, so far as possible, in dry, not dusty. weather. All damage from rain, etc., made good, and all left in perfect order when building is done. * * * All outside woodwork to have three coats of white lead and linseed oil, colored as directed."

The plaintiff entered upon the performance of said contract about the 25th day of October, 1899, and worked thereon from time to time until the 16th day of April following, when he claims to have fully completed the work. Then, or before that time, the plaintiff had been paid by the defendant the full contract price, except the sum of $110. He had also done $10 worth of extra work, which remained unpaid. To secure the payment of those two sums, the plaintiff filed the lien in question. At the time the lien was filed, the architect had not given a certificate to the effect that such sums had become due, as required in the contract made between the parties, in order to enable the contractor to recover from the owner. The claim of the plaintiff is resisted by the defendants upon the ground that he did not perform the terms of his contract, in that in painting the outside of the house he did not use the best or proper materials, and that the work was not done in the best or in a proper or workmanlike manner. The evidence clearly establishes, and the learned trial court found, that the painting done by the plaintiff was defective; "is incomplete, and not according to the specifications of the contract made between William Allan and Allen N. Moore; and the expense of fully completing said contract on the part of William Allan will be about two hundred dollars." The court, however, found:

"Ninth. That the imperfections in the painting consisted of blisters, caused by dampness from the inside of the house; that this condition was produced, not by any acts of the plaintiff, but wholly on the part and by the acts of the defendant William Allan, contractor, and the plaintiff is in no wise responsible therefor."

And the court found as a conclusion of law that there was due and owing to the plaintiff from the defendant Allan the sum of $120, being the $110 unpaid on said contract and $10 for extra work, with interest thereon from the 26th day of April, 1900, and directed judgment accordingly, and for the foreclosure of the lien, and sale of the premises. No controversy arises as to the item of $10 for extra work, or as to any work done by the plaintiff, except the painting of the outside of the house.

The only question which need be considered upon this appeal is whether or not the evidence justifies the ninth finding of fact, above quoted, made by the learned trial justice, or whether or not such finding is contrary to and against the weight of the evidence. The plaintiff testified that he commenced painting the outside of the house on the 25th day of October, 1899, about 10 days after he entered into the contract, and that he finished it about the 7th day of December; and he expressly admits by his testimony that on the 16th day of April, 1900, when he claims to have finished the job, the paint on the outside of the house was not in perfect or proper condition, and was not a good or workmanlike job. He stated that as early as the 1st of March he noticed that the paint had blistered; there was "what you might call blubbers, which I examined, and found filled with water"; and the court has found that by reason of such defects it will cost $200 to put the outside of the house in proper condition. The only excuse offered or explanation given by the plaintiff for the defective condition of the paint upon the outside of the house is that the house was permitted, after it was painted upon the outside, to become cold and damp, and to remain so during a portion of the winter, and until after the 1st of February, when a heating plant was placed in the house, and a hot fire started,—so hot that it drove the dampness or steam out through the plaster, the lath, the sheathing, and the siding, and under the paint, and thus lifted it bodily from the surface of the wood. The plaintiff gives it as his opinion that the water which he found in the "blubbers" came from the dampness in the cellar or other parts of the house, and was forced to the outside by the heat which was generated for the purpose, and only sufficiently for the purpose, of properly drying the plaster. It is true that one witness—a Mr. Penfold—expressed the opinion that houses are "built too close nowadays. It sweats from the inside. I should judge that the plastering of the house and the putting a furnace with considerable heat on the inside would produce that condition." But the witness said that this paint was not in perfect condition, and that the imperfect condition might be caused by the use of improper materials. It appears that from the time the plaintiff finished the outside painting he was in the house almost daily, doing the inside work. He was there when the furnace or heating apparatus was put in, when the fire was started, and during its continuance, and, so far as appears, he offered no objection, and made no suggestion to Mr. Allan or to the owner that any injury would result to the painting which he had done by the heat or from the lack of heat. When the plaintiff entered into the contract it was contemplated that the house should be plastered, because it is provided that, in case injury should result to the plaster because of painting, "the painter will be held responsible for all soiling of plastering, floors, hardware, etc., by himself or his employés," and clearly it was within the contemplation of the parties that the house would be so heated as to properly dry the plaster, and protect it against frost; and it is nowhere suggested in the evidence that more than sufficient heat was used for such purpose. Upon the evidence in this case it is not necessary to accept the strange and unnatural theory of the plaintiff to account for the defective condition of the painting upon the out-

side of the house in question. The contract provided that upon the outside only pure white lead and linseed oil should be used. In violation of such provision, the plaintiff mixed a large quantity of turpentine with the paint used on the outside, and the witnesses called by the defendants state that its use would account for the condition which existed, and the plaintiff does not attempt to justify its use. One witness called by the defendants, a painter of 25 years' experience, who examined the house, stated that "the paint is what is called 'mossy.' That means there was some turpentine used in the latter coats. It is not proper that should occur so soon. The use of turpentine in the outside painting is not proper." He said that general painters like to use turpentine, because it makes the work go quicker; "but it takes so much out of the lasting quality of the paint. I should say it was not good workmanship to use turpentine." This witness testified that he examined the blisters, and that they existed between the priming and the outer coats, and he gave it as his opinion that it was impossible for the heat or dampness to be forced through the siding of the house, and leave the priming coat undisturbed, and from blisters between it and the outer coat. Tho establish the truth of the proposition would hardly require the opinion of experts. Another witness, also a painter of large experience, testified that he examined the job, and that he found the blisters between the priming and the outer coats of paint, and expressed the opinion that the conditions which existed were caused by the use of improper materials. The witness stated that, "You could rub your fingers across the paint and take it off, the same as if it were not dry," and he stated that it is not proper to use turnpentine in painting outside work, and expressed the opinion that its use by the plaintiff caused the conditions which he found to exist. It appears that the barn and some of the window frames were primed by this witness, and it also appears conclusively, and is admitted by the plaintiff, that where the witness had done the priming no blistering or "blubbers" occurred. The same conditions as existed upon the sides of the house—the blistering and "blubbers" —were apparent on some of the casings of the attic windows, which were certainly far removed from the excessive heat of the furnace or the dampness of the cellar. It also appears that those casings which were primed by some one other than the plaintiff did not blister, while all those which were primed by him presented the same conditions as existed upon the sides of the house. Several witnesses were called by the defendant to show that the house was sheathed with dry and seasoned lumber, and that the siding was also thoroughly seasoned and dry; that it was the best quality of No. 1 pine, and suitable in every respect for the purpose; and this evidence was in no manner controverted by the plaintiff. It is suggested that the imperfect condition in which the paint was found might be accounted for upon the theory that the outside of the house was wet or damp when painted. If such be the fact, it can in no manner relieve the plaintiff from responsibility, because, as we have seen, the contract expressly provides and the plaintiff undertook to paint the house when dry, and, if he painted it when it was wet, he must suffer the consequences. We think the finding of the learned trial court that the imperfections in

the painting were produced wholly by the acts of the defendant Allan, and that the plaintiff is in no wise responsible therefor, is contrary to and against the weight of the evidence, and that the evidence clear-ly establishes the fact that the defective condition of the paint was due to the use of improper materials by the plaintiff, or because the outside of the house was painted when it was not sufficiently dry, and in violation of the terms of the contract. This being so, it follows that there was nothing due or owing to the plaintiff at the time the lien was filed, or at the time the action was commenced. The judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.

Judgment reversed, and new trial ordered, with costs to the appellant to abide event. All concur.